Christopher J. Kayser, OSB 984244
Cjkayser@lvklaw.com
LARKINS VACURA KAYSER LLP
121 SW Morrison St, Suite 700
Portland, Oregon 97204
Telephone: 503-222-4424

Gregory M. Nespole (*Pro Hac Vice* application forthcoming)
Correy A. Suk (*Pro Hac Vice* application forthcoming)
Daniel Tepper (*Pro Hac Vice* application forthcoming)
gnespole@zlk.com
csuk@zlk.com
dtepper@zlk.com
LEVI & KORSINSKY, LLP
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel.: 212-363-7500

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ANTHONY FRANCI, Derivatively on Behalf of DIGIMARC CORPORATION,<br><br>      Plaintiff,<br><br>          v.<br><br>RILEY MCCORMACK, CHARLES BECK, LASHONDA ANDERSON-WILLIAMS, SHEILA CHESTON, SANDEEP DADLANI, KATIE KOOL, DANA MCILWAIN, and MICHAEL PARK,<br><br>      Defendants.<br><br>   -and-<br><br>DIGIMARC CORPORATION,<br><br>          Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                    Page 1

Plaintiff Anthony Franci ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant Digimarc Corporation, ("**Digimarc**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint against Individual Defendants Riley McCormack, Charles Beck, LaShonda Anderson-Williams, Sheila Cheston, Sandeep Dadlani, Katie Kool, Dana Mcilwain, and Michael Park (collectively, the "**Individual Defendants**") for breaches of fiduciary duties as directors and/or officers of Digimarc, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff's allegations are based on his personal knowledge as to himself and his own acts and upon information and belief as to all other matters, the basis of which includes, among other things, the investigation of Plaintiff's counsel and their  review and analysis of the Company's public filings with the U.S. Securities & Exchange Commission ("**SEC**"), pleadings filed in *Ullom v. Digimarc Corporation, et al.,* No. 3:25-cv-00779-JR (D. Or. 2025) (the "**Securities Action**") news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Digimarc against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein caused substantial damage to Digimarc's reputation, goodwill, and standing in the business community and exposed Digimarc to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Digimarc in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

This action seeks to remedy wrongdoing committed by Digimarc's directors and officers from at least May 2, 2024 to May 5, 2025 (the "**Relevant Period**").

2.      Digimarc is a digital watermarking technology company that enables the secure identification and authentication of physical and digital items. Its core technology embeds imperceptible, machine-readable codes into packaging, images, and digital files, which can be detected by specialized software or hardware to verify authenticity, track provenance, and manage copyright. Digimarc's solutions are used across retail, recycling, media, and government applications. In retail, the technology powers "invisible barcodes" that streamline self-checkout and reduce theft, as seen in deployments with Walmart. In recycling, Digimarc enables automated sortation of plastic packaging by embedding watermarks that identify material composition. The technology is also used to combat counterfeiting, support content authenticity standards, and ensure traceability in supply chains and currency authentication.

3.      On May 2, 2024 — the beginning of the Relevant period — Digimarc reported its financial results via press release for the quarter ending March 31, 2024 ("**Q1 2024**"). In the release, the Company touted its revenue growth and overall financial performance, portraying a narrative of continued operational success.

4.      On August 13, 2024, Digimarc issued a press release announcing its financial results for the quarter ending June 30, 2024 ("**Q2 2024**"), stating that its revenue increased by approximately $7.2 million compared to the prior fiscal year.

5.      In the corresponding Form 10-Q for Q2 2024 filed with the SEC, Digimarc reaffirmed the previously reported financial results, attributing revenue growth to the execution of new commercial subscription agreements and higher subscription fees from existing customers.

The filing also noted that subscription revenue was partially reduced due to the renewal of a major commercial contract, which was described as delayed, but expected to be signed.

6.      On November 14, 2024, Digimarc issued a press release announcing its financial results for the quarter ending September 30, 2024 ("**Q3 2024**"), stating that there was a slight decrease in its revenue, but that it was due to the delayed timing in the anticipated renewal of a commercial contract.

7.      That same day, Digimarc filed its corresponding Form 10-Q for Q3 2024 with the SEC, stating that the decline in annual recurring revenue was primarily due to delays in the expected renewal of a key commercial contract.

8.      After markets closed on February 26, 2025, Digimarc announced its financial results for the fourth quarter and full year of 2024, reporting a decline in both subscription and annual recurring revenue. The Company attributed these decreases to the expiration of a major commercial contract earlier that year.

9.      On this news, Digimarc's stock price dropped $11.65 per share, or approximately 43.1%, to close at $15.39 on February 27, 2025, representing a sharp decline on unusually heavy trading volume.

10.      The statements referenced in ¶¶ 3–8 were materially false and misleading because each omitted adverse facts concerning the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) a key commercial partner was unlikely, or at significant risk, to renew a major contract on existing terms; (2) as a result, Digimarc would be required to renegotiate the contract and agree to less favorable conditions; (3) these developments would negatively impact the Company's subscription revenue and annual recurring revenue; and

(4) consequently, Defendants' positive statements regarding Digimarc's business outlook were materially misleading and/or lacked a reasonable basis when delivered to the market.

11.    Unbeknownst to investors, senior management was aware that demand for Digimarc's services had begun to decline but failed to disclose material adverse facts regarding the Company's business, operations, and future outlook. Specifically, Defendants concealed from investors that: (1) a key commercial partner had indicated it would not renew a significant contract on existing terms; (2) this development required Digimarc to renegotiate the contract under less favorable conditions; (3) as a result, the Company's subscription revenue and annual recurring revenue would be materially impacted; and (4) in light of these facts, Defendants' repeated public statements regarding the Company's business performance and growth prospects were materially false and misleading, or at minimum, lacked a reasonable basis.

12.    Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and/or misleading statements and omissions of material fact to the investing public whether that be through press releases and file reports with the SEC that misrepresented the Company's financial health, overstating progress and downplaying material challenges. These communications repeatedly painted an overly optimistic picture of Digimarc's revenue trajectory, customer adoption, and business prospects, misleading investors about the true state of the Company's performance.

13.    As set forth herein, and as alleged in the Securities Class Action, the Company's officers and directors substantially damaged Digimarc by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and Section 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

16.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C § 1391 because the acts and Defendants' actions have had an effect in this District, and the acts and transactions giving rise to the violations of law complained of herein, including the dissemination of false and misleading statements into this District, occurred in part in this District.

## THE PARTIES

### Plaintiff

18.     Plaintiff is and has continuously been a stockholder of Digimarc during the wrongdoing complained of herein.

### Nominal Defendants

19.     Nominal Defendant Digimarc Corporation is a publicly traded Oregon corporation. Its principal executive office is located at 8500 SW Creekside Place, Beaverton, OR, 97008. Since the Company's initial public offering in 1999, the Company's common stock trades on The NASDAQ Stock Market LLC under the ticker symbol "DMRC."

### Officer Defendants

20.     Defendant Riley McCormack ("**McCormack**") has served as a member of the Board since October 2020 and as the Company's President and CEO since April 2021. As set forth in the Proxy statement filed by Digimarc with the SEC on March 25, 2025 (the "**2024 Proxy**"), McCormack received $2,127,797 in compensation from the Company in 2024.[1] Defendant McCormack is also named as a defendant in the Securities Class Action.

21.     Defendant Charles Beck ("**Beck**") has served as a member of the Board and as the Executive Vice President, Treasurer and the Company's Chief Financial Officer ("**CFO**") since November 2013. According to the 2024 Proxy, Beck received $ 970,050 in compensation from the Company in 2024.[2]

### Director Defendants

22.     Defendant LaShonda Anderson-Williams ("**Anderson-Williams**") has served as a member of the Board since June 2023. Defendant Anderson-Williams also serves as Chair of the Compensation and Talent Management Committee, and a member of the Governance, Nominating

---

[1] Digimarc Corp., Proxy Statement (DEF 14A) (Mar. 25, 2025), at 31, https://www.sec.gov/Archives/edgar/data/0001438231/000143774925009135/dmrc20250127_def14a.htm.

[2] *Id.*

and Sustainability Committee. According to the 2024 Proxy, Anderson-Williams received $144,136 in compensation from the Company in 2024.[3]

23.    Defendant Sheila Cheston ("**Cheston**") has served as a member of the Board since October 2024. Defendant Cheston also serves as Chair of the Governance, Nominating, and Sustainability Committee and a member of the Audit Committee and the Compensation and Talent Management Committees. According to the 2024 Proxy, Cheston received $280,557 in compensation from the Company in 2024.[4]

24.    Defendant Sandeep Dadlani ("**Dadlani**") has served as a member of the Board since March 2021. Defendant Dadlani also serves as a member of the Audit Committee. According to the 2024 Proxy, Dadlani received $150,002 in compensation from the Company in 2024.[5]

25.    Defendant Katie Kool ("**Kool**") has served as a member of the Board since March 2022 and serves as Chair of the Compensation and Talent Management Committee and is a member of the Audit and Governance Committees. According to the 2024 Proxy, Kool received $187,310 in compensation from the Company in 2024.[6]

26.    Defendant Dana Mcilwain ("**Mcilwain**") has served as a member of the Board since October 2024. Defendant Mcilwain also serves as Chair of the Audit Committee and Member of the Governance, Nominating and Sustainability Committees. According to the 2024 Proxy, Mcilwain received $280,557 in compensation from the Company in 2024.[7]

27.    Defendant Michael Park ("**Park**") has served as a member of the Board since January 2024. Defendant Park is also a member of the Governance, Nominating and Sustainability,

---

[3] *Id.* at 12.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

and Compensation and Talent Management Committees. According to the 2024 Proxy, Park received \$391,627 in compensation from the Company in 2024.[8]

28.     The Individual Defendants, because of their positions with Digimarc, possessed the power and authority to control the contents of Digimarc's reports to the SEC, press releases, and presentations to investors and analysts. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to the Company's confidential information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

*Relevant Non-Parties*

29.     Rishi Bajaj ("**Bajaj**") has served as a Board member since July 2025.

## <u>SUBSTANTIVE ALLEGATIONS</u>

*Background*

30.     Digimarc is a technology company specializing in digital watermarking and digital identification solutions. Its platform enables the authentication, tracking, and verification of physical and digital items at scale, supporting applications in retail, supply chain, government, and media. Digimarc's core technology embeds imperceptible digital watermarks into packaging, labels, and digital content to facilitate automated recognition and secure data exchange. The Company derives revenue from three primary channels: (i) subscription and licensing fees for access to its digital platform and related intellectual property; (ii) usage-based fees based on item

---

[8] *Id.*

volumes and scanning activity, including applications in checkout optimization, counterfeit detection, and sustainability initiatives; and (iii) professional services and hardware sales for implementation, integration, and support of its technology.

31.    Digimarc generates revenue primarily through recurring subscription fees for access to its digital identification platform, which enables customers to embed and detect imperceptible digital watermarks in physical and digital media. These subscriptions are typically tied to long-term commercial contracts. Additional revenue comes from usage-based fees that depend on the volume of items processed using Digimarc's technology, such as product packaging or digital files, and from professional services, including system integration, onboarding, and technical support.

32.    The Company's core subscription business includes access to its digital platform, which enables customers to apply and detect imperceptible digital watermarks embedded in packaging, media, and documents. These services are designed to enhance product authentication, content protection, and supply chain transparency. Customers use Digimarc's technology for purposes such as traceability, anti-counterfeiting, and brand integrity. For the year ending December 31, 2024, subscription revenue represented the majority of Digimarc's total revenue, driven by commercial SaaS contracts with recurring payment terms, typically ranging from one to three years.

### *The Individual Defendants' False and Misleading Statements*

33.    On May 2, 2024—when the Relevant Period began—the Company's CEO Riley McCormack discussed the Company's financial results via press release for Q1 2024. The press release provided, in relevant part:

> "Q1 was another strong quarter for Digimarc. Compared to the first quarter of 2023, we grew quarter-ending Annual Recurring Revenue

(ARR) 85%, grew commercial subscription revenue 52%, and expanded subscription gross profit margin 7.5 percentage points to 87.0%,"

\*\*\*

**First Quarter Financial Results**

Subscription revenue for the first quarter of 2024 increased to $5.8 million compared to $3.9 million for the first quarter of 2023, primarily reflecting higher subscription revenue from new and existing commercial contracts.[9]

34.    On May 3, 2024, Digimarc filed its Form 10-Q for Q1 2024 with the SEC before the market opened, and reiterated its previously reported results, stating, "ARR increased to $10.9 million, or 85% from March 31, 2023 to March 31, 2024, primarily driven by the entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts."[10]

35.    On August 13, 2024, Digimarc issued a press release announcing its financial results for Q2 2024. Specifically, the press release stated, in relevant part:

Digimarc made significant progress on multiple fronts in Q2, highlighted by three exciting developments likely to have a profound impact on the second half of this year and beyond," said Digimarc CEO Riley McCormack. "This progress provides further evidence that we believe Digimarc will not only unlock the massive total addressable markets ("TAMs") on which we are focused today, but also that new TAMs can develop incredibly rapidly based on our ability to identify and authenticate physical and digital assets where other means of identification and authentication don't work well, or don't work at all.

Second Quarter Financial Results

---

[9] Digimarc Corp., Current Report (Form 8-K), Ex. 99.1 (May 2, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774924014360/dmrc20240402_8k.htm.

[10] Digimarc Corp., Quarterly Report (Form 10-Q) (May. 3, 2024), at 21, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774924014676/dmrc20240331c_10q.htm.

> Annual recurring revenue as of June 30, 2024 increased to $23.9 million compared to $16.7 million as of June 30, 2023. Subscription revenue for the second quarter of 2024 increased to $6.4 million compared to $4.7 million for the second quarter of 2023, primarily reflecting higher subscription revenue from new and existing commercial contracts.[11]

36.    In its attendant Form 10-Q for Q2 2024 filed with the SEC on August 14, 2024, Digimarc again affirmed the previously reported results. The quarterly report stated specifically:

**Revenue Recognition**

> Subscription revenue consists primarily of revenue earned from subscription fees for access to our SaaS platform and products and, to a lesser extent, licensing fees for our software products. The majority of subscription contracts are recurring, paid in advance and recognized over the term of the subscription, which is typically one to three years.[12]

***The Truth Begins to Emerge***

37.    On November 14, 2024, Digimarc issued a press release and filed its attendant Form 10-Q with the SEC for Q3 2024. The quarterly report stated, in relevant part:

**Third Quarter Financial Results**

> Annual recurring revenue as of September 30, 2024 decreased to $18.7 million compared to $19.6 million as of September 30, 2023. The $0.9 million decrease reflects a $5.8 million decrease due to the delayed timing in the anticipated renewal of a commercial contract, partially offset by new annual recurring revenue from entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts.

> Subscription revenue for the third quarter of 2024 increased to $5.3 million compared to $4.8 million for the third quarter of 2023, primarily reflecting higher subscription revenue from new and

---

[11] Digimarc Corp., Current Report (Form 8-K), Ex. 99.1 (Aug. 13, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774924026377/dmrc20240617_8k.htm.

[12] *Id.* at 8.

existing commercial contracts, partially offset by the delayed timing
in the anticipated renewal of a commercial contract.[13]

38.    Digimarc, while facing the material adverse impact of a major commercial
contract's non-renewal, downplayed the severity of the situation. In its November 14, 2024
quarterly report, Digimarc disclosed a decrease in Annual Recurring Revenue ("**ARR**"),
attributing the shortfall to the "delayed timing in the anticipated renewal" of a commercial contract.
However, this language obfuscated the fact that the contract—responsible for millions in ARR—
was not renewed on prior terms and posed a significant financial risk. By framing the issue as
simply a delay, Digimarc misled investors into believing that the revenue loss was temporary and
that renewal remained likely on favorable terms, when in truth, the revenue stream had eroded due
to renegotiation or non-renewal.

39.    That same day, Digimarc issued its Q3 2024 financial results. They stated, in
relevant part:

> ARR decreased $0.9 million, or 5% from September 30, 2023 to
> September 30, 2024, reflecting a $5.8 million decrease due to the
> delayed timing in the anticipated renewal of a commercial contract,
> partially offset by new annual recurring revenue from entry into new
> commercial subscription contracts and increased subscription fees
> on existing commercial contracts.[14]

40.    Digimarc's public-facing financial disclosures during Q3 2024 continued to mask
the true condition of its business by characterizing the contract revenue loss as the result of mere
"delayed timing" rather than a material deterioration in customer retention and pricing power. The

---

[13] Digimarc Corp., Quarterly Report (Form 10-Q) (Nov. 14, 2024), at 21
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774924035303/dmrc2024
0930_10q.htm.
[14] Digimarc Corp., Current Report (Form 8-K), Ex. 99.1 (Nov. 14, 2024),
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774924035297/dmrc2024
0904_8k.htm.

Company's Q3 2024 financial results again stated that ARR declined by $0.9 million, citing the same $5.8 million decrease tied to the delayed renewal of a commercial contract. Yet nowhere did the Company clarify that this "delay" was in fact a significant adverse development—an expired or renegotiated agreement that undermined recurring revenue. This strategic framing allowed Digimarc to present its financial trajectory as stable, despite knowing the underlying revenue sources were deteriorating.

***The Truth is Fully Revealed***

41.    The truth was fully revealed on February 26, 2025, in the Fourth Quarter and Fiscal Year 2024 Financial Results Press Release, when Digimarc finally admitted that their contracts with companies that generated large revenue for them, were not renewing. The press release specifically stated:

> **Fourth Quarter 2024 Financial Results**
>
> Annual recurring revenue (ARR[1]) as of December 31, 2024 decreased to $20.0 million compared to $22.3 million as of December 31, 2023. The $2.3 million decrease primarily reflects a $5.8 million decrease in ARR due to the expiration of a commercial contract in June 2024, partially offset by an increase in ARR from new and existing commercial contracts.
>
> Subscription revenue for the fourth quarter of 2024 decreased to $5.0 million compared to $5.6 million for the fourth quarter of 2023, primarily reflecting the expiration of a commercial contract in June 2024, partially offset by higher subscription revenue from new and existing commercial contracts.
>
> Total revenue for the fourth quarter of 2024 decreased to $8.7 million compared to $9.3 million for the fourth quarter of 2023.[15]

---

[15] Digimarc Corp., Current Report (Form 8-K), Ex. 99.1 (Feb. 26, 2025), https://www.sec.gov/Archives/edgar/data/1438231/000143774925005231/ex_761349.htm.

42.     Here, Digimarc finally admitted that its previously reported growth and revenue stability had been artificially inflated by a now-expired commercial contract. The Company acknowledged that both ARR and subscription revenue had declined, primarily due to the expiration of a key contract in June 2024. This marked the first time Digimarc openly disclosed the extent to which its financial performance had been dependent on this contract, and how its non-renewal materially impacted recurring revenue streams. These revelations confirmed what had previously been omitted or downplayed in prior press releases and SEC filings—namely, that the Company faced serious headwinds in sustaining its subscription-based revenue model.

43.     On this news, Digimarc's stock price dropped $11.65 per share, or approximately 43.1%, to close at $15.39 on February 27, 2025, representing a sharp decline on unusually heavy trading volume.

44.     On March 25, 2025, Digimarc filed the 2024 Proxy, in which Defendants solicited shareholder votes in advance of the annual stockholder meeting held on May 7, 2025. The Proxy sought approval for several proposals, including: (i) the election of seven directors to serve one-year terms; (ii) the ratification of KPMG LLP as Digimarc's independent registered public accounting firm for the fiscal year ending December 31, 2025; (iii) an advisory vote to approve executive compensation; (iv) approval of the Digimarc Employee Stock Purchase Plan; (v) approval of amendments to the Digimarc 2018 Incentive Plan; and (vi) the transaction of any other business that may properly come before the meeting.

45.     With respect to the Code of Ethics, the 2024 Proxy stated:

> Our Code of Ethics for Financial Personnel, which can be found on the Company/Corporate-Governance page of our website at www.digimarc.com. This Code of Ethics applies to the principal executive officer and principal financial officer of Digimarc and its subsidiaries and every officer, director, and employee of Digimarc who performs or influences financial transactions and reporting on

behalf of Digimarc, and their immediate family members.[16]

46.    In a section titled "The Board's Role in Risk Oversight," the 2024 Proxy stated:

**The Roles of Management and the Board**.

Digimarc's management is responsible for identifying, assessing, and managing the material risks facing Digimarc. The Board performs an important role in the review and oversight of risks, and generally oversees Digimarc's risk management practices and processes, with a strong emphasis on financial and entity-level controls.

**Delegation to Board Committees**. The Board has delegated primary oversight of the management of risks to its committees. In particular, the Board has delegated:

To the Audit Committee, financial and accounting risks, and information technology security risks, which include risks to the security of our infrastructure and systems, as well as artificial intelligence ("AI") governance;

To the Compensation and Talent Management Committee, compensation risks, employment policy risks, benefit program risks, and key personnel retention risks; and

To the Governance, Nominating, and Sustainability Committee, environmental and social risks, governance and compliance risks related to confidential reporting (via a "hotline"), personnel actions, ethics, related-party transactions, conflicts of interests and litigation, and other entity-level risks.

Each of these committees reviews these specific risk areas on a quarterly basis and routinely reports to the Board regarding that committee's oversight and findings.

**Routine Reporting and Review Process**.  To permit the Board and its committees to perform their respective risk-oversight roles, individual members of management who supervise Digimarc's risk management report directly to the Board or the relevant committee of the Board responsible for overseeing the management of specific risks, as applicable. For this purpose, management has a high degree of access and communication with independent directors. In

---

[16] Digimarc Corp., Proxy Statement (Schedule 14A) (Mar. 25, 2025), at 10 https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774925009135/dmrc2025 0127_def14a.htm.

addition, the Board oversees and participates annually in a process of risk assessment that is designed to identify the most salient enterprise risks facing Digimarc's business and to evaluate how the Company's corporate strategies align with those risks.

***Annual Risk Assessment and Review***.  On an annual basis, the Chief Legal Officer and Chief Financial Officer of Digimarc prepare, and the executive management team reviews, a master risk assessment analysis (which provides an aggregate listing of strategic, financial, employee, operational, legal, compliance, internal process, and similar risks) and provide to the Board their assessment of the immediacy and intensity of the risks. The analysis focuses on the various types of risks that can affect the operations and financial performance of the Company. The management team identifies and categorizes the key risks facing the Company and then ranks these risks as to their seriousness and probability based on management's assessment of the risk relative to Digimarc's operating environment. Taking into consideration Digimarc's risk controls and mitigation plans, the Board reviews management's analysis to identify and assess the degree and likelihood of the risks profiled. Having directors who are both knowledgeable about and sensitive to various aspects of the market and industry risks facing our business ensures that risks are reviewed from multiple vantage points.

Finally, the Board oversees organizational structure, policies, and procedures at Digimarc, such as the Code of Business Conduct and other internal policies and guidelines designed to support Digimarc's corporate governance guidelines and to comply with the laws, rules, and regulations that apply to Digimarc's business operations. Policies and procedures also allow for the Board to receive information from employees, vendors, and other interested parties. For example, the Board maintains a hotline where employees, vendors, and other interested parties may anonymously report suspected violations of any applicable law by any employee or agent, questionable accounting or auditing matters, or other ethical or legal matters. The Chair of the Board, the Chair of the Governance, Nominating, and Sustainability Committee, and the Chair of the Audit Committee receive any communication received via this hotline by default (as long as that individual is not named in the communication).[17]

---

[17] *Id.* at 4–5.

47.     The 2024 Proxy failed to disclose that the Company was beset with compliance problems that posed significant risks of harm. The 2024 Proxy also was false and misleading because it failed to disclose that: (i) the Company lacked sufficient controls, including with respect to financial reporting; and (ii) contrary to the 2024 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, and were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties.

48.     The 2024 Proxy further failed to disclose that: (i) the Company was experiencing a material trend of weakening demand from key commercial partners; (ii) as a result, Digimarc faced pressure to renegotiate contracts on less favorable terms; (iii) the Company's ability to maintain or grow its subscription revenue was significantly impaired; and (iv) contract renewals had become increasingly dependent on pricing concessions and other unfavorable adjustments.

49.     The false and misleading elements of the 2024 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors.

50.     On May 5, 2025, Digimarc issued a press release announcing its financial results for the first quarter of 2025, ending March 31, 2025 ("**Q1 2025**"). The Company stated that results "came in above our internal plan" and emphasized its focus on "driving results in our much tighter focus areas." Digimarc reported total revenue of $9.4 million, including subscription revenue of $5.3 million and services revenue of $4.1 million. The Company also disclosed that its ARR had declined to $20.0 million, attributing the decrease primarily to the expiration of a commercial

contract in June 2024, which was only "partially offset by an increase in ARR from new and existing commercial contracts."[18]

51.   The following day, May 6, 2025, Digimarc released their Form 10-Q for Q1 2025 and stated, in relevant part:

> *Subscription*
>
> The $0.4 million decrease in subscription revenue for the three month period ended March 31, 2025, compared to the corresponding three month period ended March 31, 2024, primarily reflects $1.1 million from the expiration of a commercial contract in June 2024, partially offset by higher subscription revenue from new and existing commercial contracts.
>
> &ast;&ast;&ast;
>
> *Domestic*
>
> The $0.7 million decrease in domestic revenue for the three month period ended March 31, 2025, compared to the corresponding three month period ended March 31, 2024, primarily reflects $0.7 million of lower subscription revenue, which in turn primarily reflects $1.1 million from the expiration of a commercial contract in June 2024 with a domestic customer, partially offset by higher subscription revenue from new and existing commercial contracts with other domestic customers.[19]

52.   Despite the positive tone of the release and Form 10-Q, these statements were materially misleading. Digimarc failed to disclose that the expiring contract was not being renewed on comparable terms and that ARR and subscription revenues were being structurally impacted. Moreover, the Company presented its cost-saving measures and adjusted EBITDA improvements as signs of operational strength, while omitting the fact that its financial outlook was deteriorating

---

[18] Digimarc Q1 2025 Press Release, https://www.digimarc.com/press-releases/2025/05/05/digimarc-reports-first-quarter-2025-financial-results
[19] Digimarc Corp., Quarterly Report (Form 10-Q) (Mar. 31, 2025), at 22 https://www.sec.gov/ix?doc=/Archives/edgar/data/0001438231/000143774925014773/dmrc20250331_10q.htm

due to the loss of a key revenue source. These omissions misled investors regarding the Company's true financial condition and the sustainability of its business model.

53.     Accordingly, during the Relevant Period, Digimarc issued a series of press releases, SEC filings, and other public statements that misrepresented the true state of the Company's financial condition and operations. These statements failed to disclose, among other things, the adverse impact of heightened competitive pricing pressures, the Company's inability to sustain price increases, and the weakening demand that materially affected revenue growth and contract renewals. The Company also misrepresented the effectiveness of its internal controls and failed to accurately describe the Board and Audit Committee's oversight functions. As a result, investors were misled about the Company's financial health, growth trajectory, and risk management practices.

## FIDUCIARY DUTIES

54.     Because of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Digimarc and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Digimarc in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Digimarc and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

55.     Each Individual Defendant owed and continues to owe Digimarc, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Digimarc, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Digimarc, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

57.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest, and prudent manner under the laws and regulations of Oregon and the United States pursuant to the Company's Codes of Ethics;

(c)     Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how Digimarc conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)     Establish and maintain systematic and accurate records and reports on the business and internal affairs of Digimarc, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequately functioning system of internal, legal, financial, and management controls such that Digimarc's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports of information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     Truthfully and accurately guide investors and analysts as to the Company's business operations at any given time.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Digimarc and were at all times acting within the scope of such agency.

*Duties Pursuant to the Company's Codes of Business Conduct*

59.    The Individual Defendants were subject to Digimarc's Code of Business Conduct and Ethics (the "**Code**"), which was designed to "promote honest and ethical conduct," "full, fair, accurate, timely and understandable disclosure in reports and documents," and "compliance with applicable governmental laws, rules and regulations."[20] The Code applies to "every officer, director, employee, consultant and worker of the Company,"[21] and establishes standards for professional conduct that are "important to safeguard Digimarc's good reputation and continued economic viability."[22]

60.    All Company directors, officers, and employees are required to be familiar with the Code of Business Conduct, comply with its provisions, and report suspected violations.

61.    The Code explicitly requires that "Beyond legal compliance, all Digimarc employees are expected to observe high standards of business and personal ethics in the discharge of their assigned duties and responsibilities. This requires the practice of honesty and integrity in every aspect of dealing with other Company employees, the public, the business community, stockholders, customers, suppliers, and governmental and regulatory authorities."[23]

62.    In a section titled "Compliance Responsibility," the Code of states:

> The unqualified recognition on the part of all employees of their duty to adhere to, and in the case of managers of their duty to ensure compliance of employees under their supervision with, this Code is the keystone of the Company's compliance program. In furtherance of this policy, the Company will develop and maintain communication and training programs designed to provide its employees with an understanding of the Company's expectations with respect to this policy. Such programs are part of the Company's broader efforts to develop and maintain an internal

---

[20] Digimarc Corp., Code of Business Conduct and Ethics (last revised Mar. 7, 2023), at 1–2 https://www.digimarc.com/company/corporate-governance.
[21] *Id.* at 1.
[22] *Id.*
[23] *Id.*

environment, which fosters fair treatment of employees and open communication among them.[24]

63.  With respect to enforcement of the Code, in a section titled "Disciplinary Procedures," the Code provides, in relevant part:

> The Company shall consistently enforce this Code through appropriate means of discipline, pursuant to procedures adopted by the Board of Directors or the Governance, Nominating, and Sustainability Committee thereof. Based on these procedures, it shall be determined whether violations of this Code have occurred and, if so, what disciplinary measures and/or legal proceedings will be taken against any employee who has so violated this Code.

> The disciplinary measures, which may be invoked at the discretion of the Board of Directors or the Governance, Nominating, and Sustainability Committee thereof, include, but are not limited to, counseling, warnings, oral or written reprimands, probation, reductions in compensation or suspension without pay, demotions, suspension, termination of employment or service, and restitution.

> Persons subject to disciplinary measures shall include, in addition to the violator, others involved in the wrongdoing such as: (a) persons who fail to use reasonable care to detect a violation; (b) persons who if requested to divulge information withhold material information regarding a violation; (c) supervisors who approve or condone the violations or attempts to retaliate against employees for reporting violations or violators; and (d) persons who do not report a suspected or actual violation of this Code in good faith.[25]

64.  The Company also has a separate Code of Ethics for all Financial Personnel of Digimarc Corporation (the "**Financial Code**"), which applies to "worldwide to all operations and employees of the company who manage and affect the Company's finances, books and records, public reporting, and financial transactions of Digimarc Corporation."[26]

65.  Under the section entitled "Mission," The Financial Code provides, in relevant part:

> Beyond legal compliance, all Digimarc financial personnel are expected to observe high standards of business and personal ethics in the discharge of

---

[24] *Id.* at 2.

[25] *Id.* at 10–11.

[26] Digimarc Corp., Code of Ethics for Financial Personnel (last revised Dec. 16, 2022), at 1, https://dmrcmktdocs.blob.core.windows.net/documents/FDPNE5UQXF2K-806070712-243.pdf.

their assigned duties and responsibilities. This requires honesty and integrity in every aspect of dealing with other Company employees, the public, the business community, stockholders, customers, suppliers, and governmental and regulatory authorities.[27]

66.    With respect to the Company's public reporting controls and compliance with reporting and securities laws and regulations, the Financial Code states, in relevant part:

- Honest and ethical conduct, including the ethical handling of the finances and financial transactions of Digimarc, and actual and apparent conflicts of interest between personal and professional relationships;
- Recording and maintenance of full, fair, accurate, timely and complete business and financial records for the Company;
- Preparation of full, fair, accurate, timely, complete and understandable disclosures in reports and documents that Digimarc files with, or submits to, the SEC, and other public communications made by the company;
- Compliance with applicable laws, rules, regulations, or other legal authorities;
- The prompt internal reporting to an appropriate person or persons, identified in the Code, of violations of the Code's provisions; and
- Accountability for adherence to Digimarc's Codes regarding ethics and the conduct of its financial transactions.[28]

67.    The Individual Defendants were bound by both the Code and the Financial Code, which collectively imposed stringent standards of honesty, integrity, transparency, and legal compliance. These Codes were not aspirational—they constituted enforceable obligations designed to "safeguard Digimarc's good reputation and continued economic viability" and required all officers, directors, and financial personnel to act with the highest standards of professional and ethical conduct. Among other things, the Codes mandated full, fair, accurate, timely, and understandable disclosures in the Company's public filings and communications and required the prompt internal reporting of any violations. Digimarc's Financial Code specifically emphasized the importance of recording and maintaining complete and accurate financial records,

---

[27] *Id.*
[28] *Id.* at 1–2.

ethical handling of all financial transactions, and avoiding any misrepresentations or omissions in SEC filings and public communications.

68.     Despite these clear mandates, the Individual Defendants violated both the spirit and letter of the Codes. Instead of providing investors with transparent and accurate financial disclosures, Defendants downplayed the Company's deteriorating financial condition, concealed material weaknesses in internal controls, and failed to disclose that several critical customer contracts were not being renewed—facts that were plainly material to Digimarc's financial outlook. These omissions misled investors about the Company's stability and performance, constituting not only ethical violations but breaches of their legal and fiduciary obligations. As high-level officers and directors entrusted with overseeing Digimarc's financial reporting and internal compliance, the Individual Defendants were directly responsible for ensuring adherence to the very standards they failed to uphold. Their conduct squarely contravened both the Code and the Financial Code, triggering the disciplinary accountability mechanisms contemplated in those policies.

***Duties Pursuant to the Audit Committee Charter***

69.     In addition to the duties set forth the Company's Code of Business Conduct and Ethics, Defendants Mcilwain, Cheston, Dadlani, and Kool (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to Digimarc pursuant to the Audit Committee Charter. The Charter provides that the Audit Committee is "responsible for overseeing the quality and integrity of the Company's accounting, auditing, and financial reporting practices, the audits of its financial statements, internal control over financial reporting, and other duties assigned by the Board. The committee's role includes a focus on the qualitative aspects of financial reporting to shareholders, the Company's processes for managing

business and financial risk, and compliance with applicable legal, ethical, and regulatory requirements."[29]

70.     The Audit Committee is also tasked with oversight of information technology, cybersecurity standards, and AI governance, and it serves as Digimarc's Qualified Legal Compliance Committee. As such, the Audit Committee Defendants were directly responsible for monitoring the risks and internal controls relevant to the Company's contract renewals, revenue recognition, and public disclosures during the Relevant Period.[30]

71.     In a section titled "Responsibilities," the Digimarc Audit Committee Charter states that the Committee is responsible for "overseeing the quality and integrity of our accounting, auditing, and financial reporting practices, the audits of our financial statements, internal control over financial reporting, and other duties assigned by the Board." The Charter further explains that the Committee's oversight role "includes a particular focus on the qualitative aspects of financial reporting to shareholders, our processes to manage business and financial risk, and compliance with significant applicable legal, ethical, and regulatory requirements." The Committee is also tasked with "overseeing risks in the areas of information technology, cybersecurity standards, AI governance, and in overseeing the training and testing within those areas," and it serves as the Company's Qualified Legal Compliance Committee.[31]

72.     The Charter also makes clear that the Committee "relies on the expertise and knowledge of management of the Company and the public accounting firm in carrying out its oversight responsibilities," and that "management of the Company is responsible for determining

---

[29] Digimarc Corp., Proxy Statement (Schedule 14A) (Mar. 25, 2025), at 5.
[30] *Id.*
[31] Digimarc Corp., Audit Committee Charter (adopted Oct. 2024), at 2
https://www.digimarc.com/company/corporate-governance.

that the Company's financial statements are complete, accurate, and in accordance with generally accepted accounting principles." The public accounting firm is responsible "for auditing the Company's financial statements," and ultimately, "the public accounting firm is accountable to the Board and the Committee." Finally, the Board may delegate authority to the Committee Chair, including responsibilities pursuant to the Audit and Non-Audit Services Pre-Approval Policy.[32]

73.    While the Audit Committee was responsible for ensuring that the Company had adequate internal controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill this responsibility. In fact, the Audit Committee Defendants harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

## BREACHES OF DUTIES

74.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Digimarc, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

75.    The Individual Defendants breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Digimarc substantial damage.

76.    The Audit Committee Defendants had a duty to review the Company's earnings, press releases, and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making improper

---

[32] *Id.*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                    Page 28

statements detailed herein, and failing to properly oversee Digimarc's public statements and internal control functions.

77.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Digimarc, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Digimarc has expended and will continue to expend significant sums of money.

78.     Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("**PSLRA**") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

79.     Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Digimarc or an Individual Defendant who knew that the statement was materially false or misleading when made. None of

the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or state of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statement when made.

## **DAMAGES TO DIGIMARC**

80.     As a direct and proximate results of the Individual Defendants' conduct, Digimarc has expended and will continue to expend significant sums of money.

81.     Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

82.     Moreover, the Company has provided significant compensation and benefits to Individual Defendants who breached their fiduciary duties to the Company.

83.     As a result of the Individual Defendants' conduct, Digimarc has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

84.     Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

85.     Plaintiff brings this action derivatively and for the benefit of Digimarc to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Digimarc, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act.

86.     Digimarc is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

87.     Plaintiff is, and has been continuously at all relevant times, a stockholder of Digimarc. Plaintiff will adequately and fairly represent the interests of Digimarc in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

88.     A pre-suit demand on the Board of Digimarc is futile and, therefore, excused. At the time of the filing this action, the Board consisted of 8 directors: (i) McCormack; (ii) Anderson-Williams; (iii) Cheston; (iv) Dadlani; (v) Kool; (vi) Mcilwain; (vii) Park (collectively, the "**Demand Board**") and Non Party Director Bajaj. Plaintiff needs only to allege demand futility as to half of the directors (*i.e.*, four directors) who are on the Board at the time this action is commenced.

89.     Demand is excused as to Defendant McCormack because, as Digimarc's Chief Executive Officer, he lacks the independence necessary to impartially consider a demand. McCormack serves as the Company's highest-ranking executive and derives his primary income from his role at Digimarc. In 2024 alone, he received total compensation of $2,127,797, including a base salary of $415,000, $318,720 in non-equity incentive compensation, $1,393,981 in stock awards, and additional compensation, underscoring his deep financial entanglement with the

Company and the Board that determines his pay.[33] His continued employment and remuneration are inextricably tied to the very directors who would be asked to investigate and pursue claims against him. Moreover, McCormack is directly implicated in the issuance of materially misleading statements regarding subscription revenue, annual recurring revenue, and the renewal status of key commercial contracts during the Relevant Period. Because he faces a substantial likelihood of liability and is incapable of objectively assessing whether to initiate litigation against himself or his colleagues, demand is excused.

***Demand Is Excused as to All Directors Because Each Faces a Substantial Likelihood of Liability for Issuing or Permitting Materially Misleading Statements***

90.    Plaintiff did not make a demand on the Demand Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Demand Board faces a substantial likelihood of personal liability and is incapable of making an independent and disinterested decision to bring the claims herein.

91.    The Demand Board either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

92.    Each member of the Demand Board approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93.    Each member of the Demand Board authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to

---

[33] Digimarc Corp., Proxy Statement (Schedule 14A) (Mar. 25, 2025), at 31.

shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94.     As members of the Board charged with overseeing the Company's affairs, each of the Demand Board had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Digimarc, the defendants knew, or should have known, the material facts surrounding the Company's pricing pressure and declining revenue growth.

95.     Additionally, each member of the Demand Board received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

96.     Director Defendants Anderson-Williams, Cheston, Dadlani, Kool, McCormack, Mcilwain, and Park also received a material personal benefit as a result of their breaches of fiduciary duties because they were re-elected to the Board based on the materially false and misleading 2024 Proxy.

97.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

98.     Additionally, the members of the Demand Board took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

99.     Pursuant to the Audit Committee Charter, the Audit Committee Defendants[34] were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Committee Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Committee Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

100.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties and, therefore, demand upon them is futile.

101.    Accordingly, a pre-suit demand on the Demand Board is futile and excused.

---

[34] Cheston, Dadlani, Kool, and Mcilwain (chair) are the Audit Committee Defendants. *See* https://www.digimarc.com/company/leadership.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

102.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

103.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

104.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

105.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

106.    The 2024 Proxy Statement failed to disclose, among other things, that: (i) Digimarc lacked adequate internal controls, including with respect to its financial reporting processes and oversight of key customer contracts; and (ii) despite representations in the Proxy regarding the Board's role in risk oversight and the Audit Committee's responsibilities for monitoring financial integrity, the Board and its Committees failed to meaningfully exercise these duties. Instead, they permitted the Company to issue materially false and misleading statements regarding its financial health and business outlook. As a result, the director defendants breached their fiduciary duties of loyalty and good faith.

107.    The 2024 Proxy Statement further failed to disclose that: (i) Digimarc was experiencing a material trend of increasing pricing pressures from competitors; (ii) as a result, the Company was forced to discount prices to maintain customer relationships and mitigate weakening demand; (iii) Digimarc's ability to maintain premium pricing had deteriorated, undermining its prior claims of pricing strength; and (iv) price had become a critical factor in contract negotiations and renewals, significantly impacting the Company's revenue prospects.

108.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2024 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

109.    The false and misleading elements of the 2024 Proxy led to the re-election of Defendants Anderson-Williams, Cheston, Dadlani, Kool, McCormack, Mcilwain, and Park to the Board, allowing them to continue breaching their fiduciary duties to Digimarc.

110.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy.

111.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

112.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.    The Individual Defendants by virtue of their positions with Digimarc and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Digimarc and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised the same, to cause Digimarc to engage in the illegal conduct and practices complained of herein.

114.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants**
*for Breach of Fiduciary Duties*

115.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Digimarc's business and affairs as directors and/or officers of the Company.

117.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

118.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

119.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

120.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain

adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

122.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Digimarc has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

124.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants
### *for Unjust Enrichment*

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Digimarc.

127.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Digimarc that was tied to the performance or artificially inflated valuation of Digimarc, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

128.    Plaintiff, as a shareholder and a representative of Digimarc, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

129.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

### FIFTH CLAIM

**Against the Individual Defendants**
*for Violations of Section 10(b) of the Exchange Act and SEC Rule 10(b)-5*

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    During the Relevant Period, the Individual Defendants disseminated or approved materially false and misleading public statements and failed to disclose, among other things, that: (i) Digimarc was experiencing a significant and material deterioration in its financial condition, including the non-renewal or scaling down of key customer contracts; (ii) these lost or diminished contracts had a direct and adverse impact on the Company's revenue pipeline and growth trajectory; (iii) Digimarc's purported progress in achieving commercial scale and market adoption was overstated and not reflective of internal realities; and (iv) the Company's internal controls over financial reporting were insufficient to provide reasonable assurance that material trends and uncertainties were accurately and timely disclosed to investors. As a result, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.

132.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Digimarc, their control over, and/or receipt and/or modification of Digimarc's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Digimarc, participated in the fraudulent scheme alleged herein.

133.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

134.    The Individual Defendants were among the senior management and the directors of the Company during the Relevant Period. Based on their roles at the Company, the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

135.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at the Company, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

136.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

137.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; and (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Digimarc and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would have been futile;

C.    Determining and awarding to Digimarc the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Digimarc and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable

laws and protect Digimarc and its stockholders from a repeat of the damaging events described herein;

E.    Awarding Digimarc restitution from the Individual Defendants;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

DATED: August 29, 2025.


LARKINS VACURA KAYSER LLP


s/ Christopher J. Kayser
Christopher J. Kayser, OSB 984244

LEVI & KORSINSKY, LLP

Gregory M. Nespole
Correy A. Suk
Daniel Tepper

Attorneys for Plaintiff

**VERIFICATION**

I, Anthony Franchi, do hereby verify that I am a holder of common stock of Digimarc Corporation, and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  August  6  , 2025

*Anthony Franchi*
Anthony Franchi (Aug 6, 2025 10:26:16 EDT)

Anthony Franchi